# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DAVID BRIGHTWELL,      *

Plaintiff              *

v                     *        Civil Action No. RDB-18-2652

WARDEN, *et al.*,        *

Defendants       *
                   ***

## MEMORANDUM OPINION

Pending is a Motion to Dismiss, or in the alternative, Motion for Summary Judgment (ECF 20) filed by Defendants Warden, Secretary Stephen T. Moyer, Rachel Sessa, Commissioner of Correction, Adrian Boyd, and Adetokunbo Osilesi.[1] ECF 20. Plaintiff has responded. ECF 24. Upon review of the papers filed, this Court finds a hearing unnecessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated below, the dispositive motion, construed as a Motion for Summary Judgment,[2] IS GRANTED.

## Background

### A. Plaintiff's Allegations

Brightwell is an inmate at the Maryland Correctional Institution-Jessup (MCI-J). On August 23, 2018, he filed the instant civil rights complaint presenting a laundry list of grievances about his incarceration. ECF 1. He subsequently filed an Amended Complaint alleging "conspiracy, abuse of authority, harassment, stealing property, discrimination intentionally, negligence, removal of open Court cases, Court exhibits, denial of access to Courts, mental abuse."

---

[1] The Clerk shall amend the docket to reflect the full and correct names of Defendants.

[2] Defendants' dispositive submission will be treated as a Motion for Summary Judgment under Federal Rule of Civil Procedure 56 because materials outside the original pleadings have been considered. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

ECF 8 at p. 1.

In his Amended Complaint, ECF No. 8 at p. 6, Plaintiff alleges that in February of 2017, he

entered a settlement agreement with employees of the Maryland Division of Correction resolving

*Brightwell v. Hershberger, et al.,* Civil Action No. PX-11-3278.

> The agreement, attached as an exhibit to Defendants' dispositive motion, provided:
>
> 5. Property: While housed at Patuxent Institution, Plaintiff will be allowed access to his property maintained at Patuxent Institution within one (1) day of execution of this agreement and permitted to take any and all of the following items and to the extent that he does not have these items they will be provided within two (2) days of execution of this agreement: one comb, one hairbrush, two toothpaste, two deodorants, two bars of soap, two shampoo items, one mouthwash, one pack of tooth floss, two big towels, two big wash cloths, two white writing pads, two big ink pens, twenty white envelopes, give manila envelopes, all of his legal books, all of his religious books legal cases in court (all), all new novels that the Eastern Correctional Institution [("ECI)] sent to [Patuxent] that came from Barnes and Noble, and his petition to Governor of Maryland, etc.
>
> 6. Purchase of Approved Items: Plaintiff and/or his Counsel will be allowed to purchase approved items from an approved vendor for Plaintiff's use consistent with DPSCS guidelines for such items.

*See* ECF 20-3 at pp. 4-5. In addition to defining Plaintiff's allowable property, the agreement

contemplated Plaintiff's transfer to MCI-J. *Id.* at p. 4.

On April 25, 2018, while housed at MCI-J, Plaintiff observed Officer Osilesi carrying

Plaintiff's X-Box 360 in a green trash bag. ECF 8 at p. 7. Plaintiff confronted Osilesi and accused

him of stealing his property. *Id.* Osilesi advised Plaintiff that he was told to take the property. *Id.*

Plaintiff asked to accompany the property and Osilesi told him to wait in the hallway of the G-

building Control Center. *Id.* Approximately 20 minutes later Lt. Boyd arrived with two other

correctional officers. *Id.* at p. 8. Osilesi advised the officers that Plaintiff refused to lock in to his

cell, which Plaintiff disputed. *Id.* Lloyd escorted Plaintiff to his cell and slammed the cell door. *Id.*

at p. 9.

On August 15, 2018, Plaintiff was instructed by an unidentified officer to pack up his property because he was being transferred. ECF 8 at p. 9. He was given a large green trash bag to put his property in and the bag was taken to the property room by the unidentified officer. *Id.*

When the transfer failed to occur, on August 17, 2018, Plaintiff requested that his property be returned to him. *Id.* When his property was returned several items were missing including a watch, legal books, court cases, typing paper, a "Steven Right Angle F Adapter Male to Female" for his television, evidence, exhibits, a college dictionary, Black's Law Dictionary, copies of DCDs and Directives, and certified mail receipts. *Id.* at pp. 9-10.

Plaintiff alleges generally that since he was transferred to MCI-J in 2017 he has "been harassed, disliked, mentally abused, etc., by MCI-J Correctional Staff." *Id.* at p. 10. Upon his arrival at MCI-J, Plaintiff states he was placed in an unsanitary cell, GW-145. ECF 8 at p. 11. He claims that he had to bang on the cell door in order to get the attention of staff to open the door. He also claims that at times he missed religious classes and services because the cell door could not be opened. *Id.*

Additionally, Plaintiff claims that his current cell assignment, HE-142, is also unsanitary. *Id.* He states that the toilet flushes on its own, there are large flying cock roaches, and that when the adjoining cell flushes the toilet it causes his toilet to spray waste. *Id* at pp. 11-12. Additionally he claims the cell is often flooded. He states that there are holes in the walls around the windows. *Id.* at p. 12.

Plaintiff also claims that he did not receive pay for working as a laundry man. ECF 8 at p. 12. Plaintiff states that Sgt. Blankinship inquired about his pay but all the money he earned was taken and put toward money he owed. *Id.* at pp. 12-13. Plaintiff claims this was an error as a Division of Correction Directive provides that he would be left $10.00 so that he would not become

3

indigent. *Id.* Plaintiff stopped eating to protest his lack of pay. *Id.* at p. 13. Captain Johnson investigated Plaintiff's concerns and on July 24, 2018, he was given $10.00 for spending. Plaintiff states that he should have received $30.00--$10.00 each month. *Id.*

On August 25, 2018, Sgt. James and two other correctional officers came to Plaintiff's cell to conduct a cell search. ECF 8 at p. 14. They advised Plaintiff they were looking for some books. *Id.* Plaintiff asked about his legal books, cases, and other property that had not been returned to him. *Id.* On October 14, 2018, Plaintiff addressed a request to Sgt. Jones regarding securing all of his legal books. *Id* at p. 15. He did not receive a response. *Id.*

B. Defendants' Response

i. Xbox Gaming System

On December 30, 2016, the Department of Public Safety and Correctional Services (DSPSCS) promulgated Division of Correction Directive 220-004 "Inmate Personal Property" which allowed inmates to keep authorized personal property, including an Xbox gaming consoles in their cell. ECF 20-4 at p. 36. While incarcerated at Patuxent, Plaintiff acquired an Xbox, which he brought with him on June 13, 2017 when he was transferred to MCI-J. ECF No. 20-5, ¶ 3.

On March 6, 2018, Warden Morgan prohibited any new Xboxes from entering the institution due to a statewide investigation Xboxes by the Division of Corrections. ECF 20-4 at p. 61. On April 20, 2018, all Xboxes in the institution were inspected and sealed with security tape. *Id.* at p. 62. Those inmates who possessed an Xbox were permitted to keep it. *Id.* On May 14, 2018, Commissioner Corcoran issued a memo noting that all Xboxes were being removed and examined from all facilities during the Xbox investigation and that DPSCS would thereafter return the gaming systems. *Id.*

On April 25, 2018, Officer Osilesi removed Plaintiff's Xbox from his cell pursuant to the

4

investigation. ECF 20-6 at p. 2; ECF 20-7 at p. 2. Plaintiff yelled at Osilesi and refused to lock in his cell, yelling also at Lt. Boyd and demanding to know who gave Osilesi permission to enter his cell and remove the gaming system. ECF 20-7 at p. 2. Boyd explained to Plaintiff that it was a state-wide check of the gaming system and the Xbox would be returned after the investigation was complete. *Id.*

On May 12, 2018, Plaintiff filed ARP MCI-J-0272-18 complaining that Officer Osilesi stole his Xbox from his cell. ECF 20-4 at p. 3. The ARP was investigated by Capt. Crystal Harris. ECF 20-8. Harris attempted to interview Plaintiff on May 29, 2018, but he refused to report to the supervisor's office and stated that he did not want the Xbox. *Id.* at p. 2. Capt. Harris also noted all Xbox units were inspected by staff, including Plaintiff's. *Id.* at p. 3.

On June 13, 2018, the Warden responded to Plaintiff's ARP, explaining that the ARP was dismissed because "an investigation revealed no evidence to support your claim . . . . Your property was not stolen. Your Xbox was confiscated during the statewide search of all Xbox gaming systems. ECF 20-4 at p. 7. On or about May 29, 2018, the Xbox was presented to Plaintiff, but he refused to take it. ECF 20-4 at p. 8. Plaintiff was advised that the X-Box was in the property vault awaiting his action. ECF 20-4 at p. 8; ECF 20-9, ¶ 4.

Plaintiff filed IGO No. 20181170 on July 11, 2018 as an appeal from the ARP MCI-J 0272-18. ECF 20-11, ¶ 5. The IGO dismissed Plaintiff's grievance on November 2, 2018, based on a determination that Plaintiff failed to state a claim and further finding that Plaintiff had been presented with a confiscation form regarding the X-Box which he refused to sign and that efforts were made to return the X-Box, but Plaintiff refused to accept it.. ECF 20-4 at p. 8.

      ii..     Wages

Plaintiff was employed as a laundry worker at MCI-J beginning on March 2, 2018. ECF

20-9 at pp. 2, 9, 12; ECF 20-4 at p. 12. Prior to his employment he was indigent. *Id.* As a laundry worker, he earned a monthly salary of $29.45. ECF 20-9 at p. 13. On May 17, 2018, he was paid $57.00, representing his wages for March and April , 2018. *Id.*, p. 9. Plaintiff had incurred debts of $910.00 for federal court filing fees, $57.39 in state fees, and $8.00 for copy card purchases. *Id.* Funds were deducted from Plaintiff's account and applied toward his debts. On May 17, 2018, $11.40 and $35.60 were deducted from his inmate account to pay on his federal and state debts respectively. *Id.* On June 4, 2018, $5.89 was taken from Plaintiff's account and applied to his federal debt and $13.56 was taken and applied to his state debt. *Id.*

On August 1, 2018, plaintiff filed ARP MCI-J-0459-18 alleging he was denied wages for the first two months of his employment as a laundry worker on the evening shift. ECF 20-4 at p. 11. The ARP was dismissed as untimely. *Id.* Plaintiff's appeal to the Commissioner was also dismissed. *Id.* at p. 9. On September 24, 2018, Plaintiff filed IGO No. 20181594 as a grievance appeal from the disposition of ARP-MCIJ-0473-19, complaining that ARP MCIJ-0459-18 was improperly dismissed. ECF 20-11, ¶ 6. The grievance was dismissed on October 31, 2018, due to Plaintiff's failure to properly exhaust the ARP process. *Id.*

      iii.    Conditions of Confinement

When Plaintiff arrived at MCI-J on June 15, 2017, he was assigned to cell GW-145. ECF 20-5, ¶ 3. He was transferred to HW-130 on June 11, 2018, HE-213 on June 18, 2018, and HE-142 on June 22, 2018. *Id.*

Defendants explain that DPSCS contracts with Home Paramount Pest Control to provide for treatment of pests. ECF 20-5, ¶ 4. Services were provided by the company between June 18, 2018 and December 10, 2018. *Id.*, at pp. 5-14. Additionally, Plaintiff's cell was sprayed weekly to avoid infestation. ECF 20-4, ¶ 3.

6

Defendants further explain that documents regarding an inmate's cell are only generated when a specific problem is detected or reported and that correctional officers observed Plaintiff's cell daily. *Id.* The only documentation regarding a problem with Plaintiff's cell was on January 17, 2019, when it was discovered that hot water in cell HE-142 was running non-stop, the water pressure was high, and the toilet was backing up, caused by a spork and a pair of underwear that were lodged in it. ECF 20-5, ¶¶5-6; ECF 20-5 at p. 3. Maintenance Acting Lieutenant Galata reported the issue and Officer Eubanks stopped the water from running, adjusted the water pressure and unclogged the toilet. ECF 20-5 at p. 3. Galata avers that he inspected the history of work orders for all cells where Plaintiff has been confined since his arrival at MCI-J and did not find any other work orders. ECF 20-5, ¶ 6.

Plaintiff filed ARP MCI-J-0496-17 on June 15, 2017, complaining about the conditions of his cell. ECF 20-4 at p. 15. He asserted that cell GW-145 was "very filthy and had the look of infectious [sic] of the cell." *Id.* On July 11, 2017, Plaintiff withdrew the ARP. ECF 20-9 at pp. 3, 5.

### iv. Personal Property

On August 15, 2018, an inventory of the property in Plaintiff's cell was completed. At that time Plaintiff possessed a wrist watch and 1.5 cubic feet of personal, religious, and legal books and papers. ECF 20-10, p. 3. Plaintiff was not present during the inventory. *Id.* Lajoie Jones, Property Room Supervisor for MCI-J, denies searching Plaintiff's cell on August 25, 2018. ECF 20-10, ¶ 4. Additionally, Jones did not speak with Plaintiff on that date about any legal books, cases or other property. *Id.*, ¶ 5. Sgt Jones also denies that Plaintiff submitted any requests either orally or in writing asking to be provided with items of his property. *Id.* Jones also denies receiving any request from Plaintiff on October 15, 2018 for legal books or any other items. *Id.*, ¶ 6. Jones

7

inventoried the property room on February 6, 2019 and verified that three boxes of paper work and Plaintiff's Xbox gaming system were being held for him in the MCI-J property room. *Id.*, ¶ 7. After requesting in writing to do so, Plaintiff may review the three boxes of materials to determine what legal materials, if any are present, and he may review the materials and exchange papers as needed. *Id.*

## Standard of Review

Defendants have filed a Motion to Dismiss, or, in the Alternative, for Summary Judgment. Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). To the extent that grounds for dismissal are based solely on the contents of the Complaint, the Court may dismiss under Rule 12(b)(6) if the complaint does not allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pled allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Rule 12(d) requires courts to treat a Rule 12(b)(6) motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the

nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied by the title of the Motions. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d), or otherwise put the district court on notice of the reasons why summary judgment is premature. *See Harrods, Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002). Plaintiff has not filed a Rule 56(d) affidavit or otherwise requested discovery in this matter. Under these circumstances, the Court will construe Defendants' Motion as a Motion for Summary Judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S.

9

at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

Because he is proceeding pro se, Plaintiff's submissions are liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, this Court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted).

## Analysis

### A. Exhaustion

Defendants raise the affirmative defense that Plaintiff has failed to exhaust his administrative remedies. If Plaintiff's claims have not been properly presented through the administrative remedy procedure they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532

(2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. Appx. 253 (4th Cir. 2004).[3]

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005). Nevertheless, a claim that has not been exhausted may not be considered by this Court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, __ U.S. __, 136 S.Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 136 S.Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining"[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he. . . . PLRA amendment made clear that exhaustion is

---

[3] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id.* at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Corr. Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," Md. Code Ann. Corr. Servs. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford,* 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). But the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

DPSCS has an established "administrative remedy procedure" ("ARP") for use by Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code Ann. (2008 Repl. Vol.), Corr. Servs. ("C.S."), §§ 10-201 *et seq.*; Md. Code Regs. ("COMAR") 12.02.28.02(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance" to include a "complaint of any individual in the custody of the [DOC] against any officials or employees of the [DOC] arising from the circumstances of custody or confinement." COMAR 12.07.01.01(B)(7). "A court may not consider an individual's grievance that is within the jurisdiction of the [Inmate Grievance] Office or the Office of Administrative Hearings unless the individual has exhausted the remedies" set forth in C.S. Title 10, Subtitle 2. C.S. § 10-210(a).

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office ("IGO") against any DOC official or employee. C.S. § 10-206(a). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must

first follow the institutional ARP process, before filing a grievance with the IGO. *See* C.S. § 10-206(b). There is an established administrative remedy procedure process that applies to all Maryland prisons. COMAR 12.02.28.01 *et seq.* Therefore when the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO.

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official" COMAR 12.02.28.02(D)(1), which is defined by COMAR 12.02.28.02(B)(14) as "the warden or other individual responsible for management of the correctional facility" and defined under C.S. § 1-101(k) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B).

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP or fails to respond to the ARP within the established time frame. The prisoner has 30 days to file an appeal to the Commissioner of Corrections. COMAR 12.02.28.14(B)(5).

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO.[4] COMAR 12.02.28.18; C.S. § 10-206(a); COMAR 12.07.01.05(B). When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR

---

[4] If the Commissioner fails to respond, the grievant shall file anr appeal within 30 days of the date the response was due. COMAR 12.07.01.05(B)(2).

12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing." C.S. § 10-207(b)(1); *see also* COMAR 12.07.01.06(B). An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208; COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07(D); *see also* Md. Code Ann., State Gov't § 10-206(a)(1).

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(ii); COMAR 12.07.01.10(A)(2). However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. See COMAR 12.07.01.10(B); C.S. § 10-209(b)(2)(c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. An inmate need not, however, seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See, e.g., Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219; *see Moore*,

517 F.3d at 725 (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies). It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 286 F. Supp. at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo*, 286 F.3d at 1024 (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, 136 S.Ct. 1850 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id.* at 1855. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id.* at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 1855. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore,* 517 F.3d at 725.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently

15

unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Exhausting administrative remedies after a complaint is filed will not save a case from dismissal for failure to exhaust administrative remedies. *See Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001) (overruled on other grounds). In *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999), the court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court. . . . The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." *See Kitchen v. Ickes*, Civil Action No. DKC-14-2022, 2015 WL 4378159, at *8 (D. Md. July 14, 2015); *see also Blackburn v. S. Carolina*, No. C A 006-2011-PMD-BM, 2009 WL 632542, at *1 (D.S.C. Mar. 10, 2009), aff'd, 404 F. App'x 810 (4th Cir. 2010); *Kaufman v. Baynard*, CIV.A. 1:10-0071, 2012 WL 844480 (S.D.W. Va. Feb. 3, 2012), *report and recommendation adopted*, CIV.A. 1:10-0071, 2012 WL 844408 (S.D.W. Va. Mar. 12, 2012); *Miller v. McConneha, et al.*, JKB-15-1349, 2015 WL 6727547, at *3-4 (D. Md. November 11, 2015).

It is clear from the record evidence that Plaintiff failed to exhaust his administrative remedies as to each of his claims. Although Plaintiff indicates he is only permitted to file two ARPs per month, he does not claim that the limitation on the number of the ARPs he is permitted to file was the reason he failed to exhaust his remedies as to each of the claims asserted. Instead, Plaintiff admits in his Complaint that he only pursued administrative remedies as to his claim regarding the

16

loss of his Xbox. ECF 1. Despite having begun the administrative remedy process as to this claim, Plaintiff failed to complete the administrative process **prior** to filing this case.

Similarly, Plaintiff began the administrative grievance process regarding his wage claim but erred in two respects. First, he failed to properly utilize the administrative remedies at the institution level by failing to file the ARP in a timely fashion. Secondly, his appeal to the IGO of his claim was not completed **prior** to filing this Complaint.

As to Plaintiff's claims regarding unsanitary cell conditions, while Plaintiff filed an ARP regarding this issue he admits that he withdrew the ARP after speaking with the housing lieutenant who advised Plaintiff the cell would be painted. ECF 24-3 at p. 5.

Plaintiff argues in his opposition response that the PLRA does not apply to claims of conspiracy, discrimination, and retaliation and that the PLRA cannot address matters previously addressed in Civil Action No. PX -11-3278. ECF 24 at p. 15. Plaintiff is incorrect. The PLRA, as discussed above, applies to all incidents of prison life. If Plaintiff believes that his property was improperly handled in violation of the previously-litigated agreement, or that his cell assignment was manipulated based on a conspiracy among staff, he must pursue those claims through each stage of the administrative grievance process **before** filing suit in this Court.

Even if Plaintiff had exhausted his administrative remedies, Summary Judgment would still be entered in favor of all the Defendants in this case.

B. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S. Const. amend XI. In effect, the Eleventh Amendment bars suits for damages against a state in

17

federal court unless the state has waived its sovereign immunity or Congress has abrogated its immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). Moreover, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). Plaintiff's claim for damages asserted under 42 U.S.C. § 1983, may not proceed against Defendants in their official capacity. Congress did not abrogate the states' sovereign immunity when it enacted 42 U.S.C. § 1983. *Will*, 491 U.S. at 66. While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Halderman*, 465 U.S. at 100 (emphasis in original).

To the extent Plaintiff has sued Defendants in both their personal and official capacities, his official capacity claims must be dismissed. In *Kentucky v. Graham,* 473 U.S. 159, 165 (1985), the Supreme Court explained "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.,* 436 U.S. 658, 690 (1978) (citations omitted)). Thus, official capacity claims are subject to sovereign immunity under the Eleventh Amendment. *Graham,* 473 U.S. at 167; *accord Hafer v. Melo,* 502 U.S. 21, 25. Plaintiff's claims

under 42 U.S.C. § 1983 for damages asserted against Defendants in their official capacity are barred.

C. Personal Participation

The Complaint does not set forth any personal participation by Defendants Secretary Moyer, Rachel Sessa, Commissioner of Correction Wayne Hill, and "Warden of MCI-J" in the Complaint allegations. Liability under §1983 attaches only upon personal participation by a defendant in the allegedly unconstitutional conduct. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Other than being named in the caption, these four Defendants are not otherwise mentioned as participants in the factual allegations of the Complaint, nor does Plaintiff attribute any action or inaction to these Defendants that resulted in denial of his constitutional rights.

Additionally, it is well established that the doctrine of respondeat superior does not apply to § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Nothing in Plaintiff's allegations suggests Secretary Moyer, Rachel Sessa, Commissioner

19

of Correction Wayne Hill and "Warden of MCI-J" had knowledge of the alleged constitutional violations, or any other concerning behavior, but failed to act. Accordingly, Plaintiff cannot succeed on a claim against Secretary Moyer, Rachel Sessa, Commissioner of Correction Wayne Hill and "Warden of MCI-J" premised on supervisory liability.

D.     Access to Courts

Plaintiff claims that his legal materials were confiscated, and he was therefore denied access to the courts. Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U. S. 817, 821 (1977). However,

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U.S. 343, 355 (1996).

"[A] prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) (quoting Lewis, 518 U.S. at 355). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing." *Lewis*, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" or "arguable" claim was frustrated or impeded because of the denial of access to the courts. *Id.* at 352-53 & n.3. The complaint must contain a sufficient description of the predicate claim to permit an assessment of whether it is "nonfrivolous" or "arguable." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Allegations of injury arising from the denial of access to the courts must be specific and articulate how the litigation was harmed. *See Ali v. District of Columbia*, 278 F.3d 1, 8 (D.C. Cir. 2002) (holding that an allegation that the failure to transport a prisoner's legal documents to his prison caused his unspecified "open case" to be "set back" did not state a claim of actual injury from a denial of access to courts); *see also Johnson v. Hamilton*, 452 F.3d 967, 973-74 (8th Cir. 2006) (dismissing an access-to-courts claim arising from the alleged destruction of the prisoner's legal papers because there were no allegation of facts supporting a finding of injury or prejudice). *Cody*, 256 F.3d at 769-70 (holding that lack of access to computer disks containing the prisoner's legal materials did not establish a denial of access to courts because the vague allegation that the stored data would "set him free" was insufficient to establish actual injury). Generally, allegations of delay in legal proceedings that do not result in "actual substantial prejudice to specific litigation" are insufficient to state a claim for denial of access to courts. *See Johnson v. Barczak*, 338 F.3d 771, 773 (7th Cir. 2003).

Here, Plaintiff merely alleges that unspecified legal materials were improperly confiscated from him. He has not identified any legal proceedings impacted as a result, and this Court cannot determine whether Plaintiff was challenging his sentencing, conviction, or conditions of confinement, as necessary to support an access to courts claim. *Lewis*, 518 U.S. at 355. In short, Plaintiff has failed to allege the required "nonfrivolous" claim with sufficient specificity to allow for evaluation of whether he has satisfied this requirement. *Id.* at 353; *Christopher*, 536 U.S. at 415. Additionally, he has not provided a basis to find actual injury as Plaintiff has failed to allege any injury arising from the alleged confiscation of his unspecified legal materials.

E. Conditions of Confinement

To the extent Plaintiff alleges that the conditions of his cell violated his rights under the

21

Eighth Amendment, his claim also fails. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). Conditions of confinement that "involve wanton and unnecessary infliction of pain," or which "deprive inmates of the minimal civilized measure of life's necessities," may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* In order to establish the imposition of cruel and unusual punishment in conditions of confinement, a prisoner must prove two elements: that "'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that *subjectively* the officials act[ed] with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko*, 535 F.3d at 238 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298–300 (1991)).

The objective prong of a conditions claim requires the prisoner to "'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions,' or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" violates the Eighth Amendment, even if "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011). To establish a

22

sufficiently culpable state of mind, there must be evidence of deliberate indifference, in that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U.S. at 302–03 (applying the deliberate indifference standard to conditions of confinement claims). "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

Defendants explain that DPSCS contracts with Home Paramount Pest Control to provide treatment of pests, which occurred on a weekly basis. Moreover, they indicate that the only repair order regarding any cells Plaintiff occupied concerned hot water constantly running and a toilet clogged by objects placed therein. When these issues were discovered they were promptly repaired. Plaintiff has failed to allege, much less demonstrate, that he suffered any injury as a result of the conditions claimed.

F.  Property Claim

Plaintiff's claims regarding the handling of his property and lost wages are also unavailing. The United States Supreme Court has held that claims of negligent deprivation of property by a prison official do not implicate the Due Process Clause. *See Daniels v. Williams*, 474 U.S. 327, 335-36 (1986). A claim of intentional deprivation of property by a prison official also would not state a constitutional due process claim, provided that the prisoner has access to an adequate post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Tydings v. Dep't of Corrections*, 714 F.2d 11, 12 (4th Cir. 1983) (finding that Virginia law provides for an adequate post-deprivation remedy). The right to seek damages and injunctive relief in Maryland courts in a tort action constitutes an adequate post-deprivation remedy for inmates in Maryland prisons. *See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982) ("[T]here is no question that the relief available to

plaintiff in state court is adequate."); *see also Hawes v. Foxwell*, No. DKC-17-2598, 2018 WL 2389060 at *4 (D. Md. May 25, 2018) (noting that the Maryland Tort Claims Act and the IGO provide adequate post-deprivation remedies), *Fuller v. Warden*, No. WMN-12-43, 2012 WL 831936 at *2 (D. Md. Mar. 8, 2012). Thus, the claims that Plaintiff's personal property was negligently or intentionally destroyed or tampered with as well as the claim that his wages were improperly calculated do not state a constitutional claim for relief. *See Hawes*, 2018 WL 2389060 at *4 (D. Md. May 25, 2018) (dismissing an inmate's property loss claim for failure to state a cognizable constitutional claim); *Fuller v. Horning*, No. WMN-11-1917, 2012 WL 2342947, at *7 (D. Md. June 19, 2012), *aff'd,* 504 F. App'x 218 (4th Cir. 2013) (stating that "removal of property from a prisoner simply does not state a constitutional claim"); *Young-Bey v. Miller*, No. JKB-16-3435, 2018 WL 4108076 at *4 (D. Md. Aug 29, 2018) (holding that a claim that personal property was destroyed did not assert a constitutional violation).

G. Harassment and Conspiracy

Plaintiff's nonspecific claims of harassment and conspiracy are also insufficient to state a claim. To establish a civil conspiracy under § 1983, a plaintiff must present evidence that the defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy, which resulted in deprivation of a constitutional right. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). An essential element for a claim of conspiracy to deprive a plaintiff of a constitutional right is an agreement to do so among the alleged co-conspirators. *See Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1006-07 (4th Cir. 1987). Without an agreement, the independent acts of two or more wrongdoers do not amount to a conspiracy. *See Murdaugh Volkswagon v. First Nat'l Bank*, 639 F.2d 1073, 1075-76 (4th Cir. 1981). A plaintiff must allege facts establishing that defendants shared a "unity of purpose or a common design" to

24

injure him. *Am. Tobacco Co. v. United St*ates, 328 U.S. 781, 809-10 (1946). Plaintiff has failed to allege any evidence of an agreement to deprive him of his constitutional rights that could sustain a civil conspiracy claim under § 1983.

Likewise, Plaintiff's general claims of harassment are unavailing. "'Although prisoners have a right to be free from [...] abuse, whether at the hands of fellow inmates or prison guards, the Eighth Amendment's protections do not necessarily extend to mere verbal [...] harassment.'" *Jackson v. Holley*, 666 F. App'x 242, 244 (4th Cir. 2016) (quoting *Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004)). Verbal threats and harassment do not state a constitutional claim. *Barney v. Pusipher*, 143 F. 3d 1299, 1310 n. 11 (10thCir. 1998); *accord Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) (holding "verbal harassment or profanity alone, 'unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right"); *Cole v. Cole*, 633 F.2d 1082, 1091 (4th Cir. 980). Simply stated, Plaintiff's bald allegations of harassment fail to state a claim.

H. Breach of Contract

To the extent Plaintiff claims that Defendants failed to abide by the settlement agreement and such failure constituted a breach of contract, his claim fails. First, the Court observes that Plaintiff's reliance on the settlement agreement reached in Civil Action PX-11-3278 to assert claims arising at his current place of incarceration appears misplaced as the explicit terms of the agreement extends only to Plaintiff's access to property while housed at the Patuxent Institution, a place where Plaintiff is no longer confined. Further, the agreement specifies that Plaintiff's property must conform to the specification of the property guidelines as set out by DPSCS. It does not appear that the settlement agreement was breached. Moreover a breach of contract does not state a

constitutional claim.[5] *See Coastland Corp. v. Currituck Cnty.*, 734 F.2d 175, 178 (4th Cir. 1984).

I.  Injunctive Relief

Plaintiff's request for injunctive relief is also denied. A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren,* 553 U.S. 674, 689–90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). For the reasons discussed above, Plaintiff has failed to demonstrate the likelihood of success on the merits and for this reason alone his request for injunctive relief must be denied. Moreover, Plaintiff has also failed to demonstrate that he is likely to suffer irreparable harm or that the balance of equities tips in his favor.

---

[5] To the extent that Plaintiff intended to raise pendent State claims of breach of contract or negligence against the named Defendants, this Court declines to exercise supplemental jurisdiction over those claims. "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)).

## Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, IS GRANTED.[6] Specifically, the dispositive motion construed as a Motion for Summary Judgment IS GRANTED and Judgment ENTERED as to all Defendants in this case. A separate Order follows.

August 21, 2019

Date

RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE

---

[6] Having found no constitutional violation, the Court need not address Defendants' claim that they are entitled to qualified immunity.